[Cite as *State v. Phillips*, 2017-Ohio-7107.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                        Court of Appeals Nos. WD-16-020
                                                                                    WD-16-028
            Appellee                                                           WD-16-029

v.                                                          Trial Court Nos. 2015CR0349
                                                                                    2015CR0388

Terrance Lavander Phillips

                                                            **DECISION AND JUDGMENT**
            Appellant

                                                            Decided:  August 4, 2017

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

**Introduction**

{¶ 1} In these consolidated appeals, appellant Terrance Phillips, appeals a jury

verdict finding him guilty as to two, multiple count indictments.  The events alleged in

the indictments occurred on August 15 and 16, 2015. According to the state, Phillips fired two bullets from his vehicle at a Ohio State Highway Patrol cruiser. Both cars crashed, and Phillips fled the scene. Phillips then committed a series of breaking and enterings and one home invasion, before he was apprehended.

{¶ 2} Appellant was found guilty of all charges and specifications against him and was found to be a repeat violent offender. The Wood County Court of Common Pleas sentenced Phillips to 41.5 years in prison. Appellant appeals.

{¶ 3} For the reasons that follow, we affirm the judgment below.

**Facts and Procedural History**

{¶ 4} The following evidence was offered at trial: Ohio State Highway Patrol Trooper Anthony J. Scherley was working the night shift on the evening of August 15, 2015, when he responded to a serious, vehicular accident on I-75 in Wood County. After the driver was transported by medical helicopter to a hospital in Toledo, Scherley followed in his cruiser and headed north, on I-75. The cruiser was clearly marked with reflective decals, identifying it as a police vehicle.

{¶ 5} Sometime after 10 p.m., Trooper Scherley came upon Phillips' blue Dodge Charger. Both were in the left lane, and Scherley, who was traveling about 85 miles per hour, changed lanes to go around Phillips. Scherley passed Phillips and continued on his way north.

{¶ 6} According to Scherley, Phillips then increased his speed to catch up with Scherley's cruiser. Scherley testified, "I heard a loud bang, all of my lights in my patrol car from my dashboard audio they all lit up and I had no more brakes." As Scherley tried

2.

to "figure out what was going on to my car, [Phillips'] Dodge Charger that was in the left lane just takes off, and is easily doing 100 miles an hour plus, takes off northbound."

{¶ 7} Trooper Scherley coasted his cruiser off of the highway, onto an exit ramp, that was closed for construction, until it came to a stop. He observed Phillips' Charger ahead of him, about 150 feet, also on the closed-exit ramp, which had crashed. Witnesses from a third vehicle stopped to offer assistance to Scherley and reported that two people had exited Phillips' Charger and had taken off running.

{¶ 8} While examining his cruiser to understand why the brakes had failed, Scherley saw a bullet hole in the left front quarter panel of the vehicle. He radioed dispatch to report a problem with his vehicle and to request a "BOLO" (be on the lookout) for two people who should be considered armed and dangerous.

{¶ 9} The other person traveling in Phillips' car that night was Carl Spruiel. Spruiel, who lives in Detroit, testified that he had spent August 15, 2015, drinking in Columbus, Ohio with a girlfriend. When he was ready to return home, he called Phillips, who was traveling back home to Detroit, from West Virginia. Phillips offered to come get him. Spruiel denied that he accompanied Phillips to West Virginia.

{¶ 10} Spruiel described himself as very intoxicated and claimed that, while riding home, he "passed out" with head phones on, listening to music. Headphones were recovered from Phillips' vehicle, and the passenger side seat was in the full recline position.

{¶ 11} Spruiel testified that he was awakened when the Charger crashed and he hit his head on the front seat airbags that deployed. He denied that he heard the sounds of a

3.

weapon being discharged from inside the car. Spruiel also denied that he fled the scene with Phillips. Instead, he testified that he climbed out of an open window of the vehicle and looked around for Phillips. He said he "was trying to figure out what is going on, like, why is the car crashed? Why is [Phillips] missing?]."

{¶ 12} Within 15 minutes of the incident, Carl Spruiel was apprehended. At the time, he was walking along the shoulder of I-75. He was initially charged with several crimes, and his hands were tested for gunshot residue ("GSR"). Spruiel tested negative for GSR, and all charges against him were ultimately dropped. Spuiel testified freely at trial, not as part of any plea agreement.

{¶ 13} Efforts to capture Phillips included a manhunt by air and foot. Around 11:30 a.m. on August 16, 2015, Trooper Charles Grizzard received word that a Perrysburg Township resident had observed a person matching Phillips' description, who was riding a bicycle down a street. Grizzard drove to the location and observed Phillips on a bicycle, carrying a gas can and a bottle of water. Grizzard told Phillips to "stop." Phillips ignored the command and instead tossed the bottle of water at the squad car. With the help of two Perrysburg Township police officers, Grizzard forced Phillips off the road. At that point, Grizzard used a "taser" on Phillips, who immediately "seized up" and "dropped to the ground."

{¶ 14} When Phillips was taken into custody, a key fob was removed from his front shirt pocket which fit the abandoned Dodge Charger. Also, a photograph taken at the scene shows Phillips covered in bug bites and mud, as a result of having spent much of the night in a muddy soy bean field near the highway.

4.

{¶ 15} Phillips confessed immediately, and several more times, over the next couple of days. The first person Phillips confessed to was Ohio State Highway Patrol Lieutenant R.J. Ashenfelter, who was at the scene after Phillips was apprehended. Ashenfelter testified,

> I walked over to the suspect at this point and briefly checked on him and asked him if he was okay. * * * [A]ll I did was ask him if he was okay. [I said,] "What we are going to do is take you to the hospital, just cooperate," and he said, "I didn't meant to shoot the trooper. I didn't mean to shoot him." He goes, "I didn't know it was a trooper. There were black cars or trucks coming all of the way from West Virginia chasing me, I didn't know it was a trooper. I didn't mean to shoot a trooper."

{¶ 16} Later, at the hospital, Phillips repeated his confession to Ashenfelter. Ashenfelter described the scene:

> I walked in, he immediately started saying to me, "I didn't mean to shoot at the Trooper. I said, "Look, now is not the time. I am not asking you any questions. You are going to have your time to tell your story later." He said, "I didn't mean to shoot at the trooper." He starts talking to me again about the black trucks and people following him from West Virginia, "I didn't mean to shoot at the trooper." And at this point I told him, Stop. I'm going to read you your rights." And I said, "Because you are just telling me too much and I don't need to know anymore. I am not asking you questions, but I am going to ask you for consent to the GSR

kit." * * * As I am reading them to him, he is reciting them with me like he knows them better than I do. So I said, "Do you understand?" He goes, "Yes." I said, "Okay. Stop talking to me. I'm asking you now, will you give consent for me to take the GSR kit?" He goes, "You will only need my right hand, that's the one I shot with." Then I said, "Okay." I did both hands.

{¶ 17} Phillips also told Ashenfelter that "my buddy in the car [Carl Spruiel] had nothing to do with this."

{¶ 18} Phillips tested negative for GSR on his hands.

{¶ 19} Trooper Elizabeth Petro also interviewed Phillips on the day of his arrest, after his release from the hospital. Phillips' interview was videotaped, and the tape was received as an exhibit at trial. During the interview, Phillips told the following story:

{¶ 20} An unnamed individual from West Virginia, who had given him drugs, was trying to kill him. Phillips told Petro that he had snorted "meth" and that he had not eaten or slept in four days. Phillips reported that he fired two shots from his vehicle, and he expressed remorse for doing so. Phillips never told Trooper Petro that Spruiel had fired the shots at the trooper's vehicle. He also never expressed any fear of Spruiel or claimed that Spruiel threatened to harm him.

{¶ 21} Finally, Phillips confessed to a Sergeant Rod Smith with the Wood County Sheriff's Office, who interviewed Phillips while in custody. The taped interview was played for the jury. During the interview, Phillips claimed that he was being chased as he traveled from West Virginia by a "couple of trucks" and "that the truck was coming up

6.

behind him again so he [Phillips] pulled the gun out."  Phillips also told Smith that he took the gas can which he said was outside, not inside, of a garage.

{¶ 22} A semiautomatic weapon was recovered from Phillips' vehicle, as were two "spent" shell casings.  Kevin Belcik is a firearms expert with the Ohio Bureau of Criminal Investigations ("BCI").  Belcik examined the firearm, the two shell casings and the bullet recovered from Trooper Scherley's cruiser.  Based upon his testing and analysis, he concluded that the bullet and shell casings were all fired from the handgun.

{¶ 23} Devonie Herdeman is an expert in DNA comparison with the BCI, and she analyzed the DNA collected from the trigger of the handgun.  According to her, the sample taken from the trigger of the handgun matched Phillips' DNA profile.

{¶ 24} Five homeowners, who live along Mercer Road, in Wood County, all testified.  The first testified that, on August 16, 2016, he discovered that a door to his "outbuilding" had been kicked in and damaged.  The second witness said that his wife's bicycle was taken from their property, which he did not realize until it was returned by a sheriff, following Phillips' arrest.  A third witness, a man, testified that, at around 3:00 or 4:00 a.m. on August 16, 2015, he was asleep in his home, when his dog, who was in his garage "started going nuts."  The next day he found that his camper door was open and the framework on his horse barn door was cracked.  Inside the barn, he found his newly washed ATV had mud on it.  He testified that the clothes that Phillips was wearing when captured, belonged to him, including a long sleeve "Harley Davidson" shirt and a hat.  His wife, the fourth witness, testified that she found a wad of clothes, not belonging to them, hidden in a towel in the camper.  A fifth witness testified that she received a call at

7.

work on August 16, 2015, from her home alarm company that the alarm had been activated.  She went home and found her back door ajar.

{¶ 25} At trial, Phillips' story diametrically changed from the one he reported at the time of his arrest.  Phillips testified that it was Spruiel, not him, who shot at the trooper's vehicle.  According to Phillips, he, Spruiel, and a woman, "C.F.", drove from Detroit to West Virginia on August 15, 2016.  While there, Spruiel argued with another man about money.  Phillips and Spruiel left, to return to Detroit, and saw trucks following them.  Phillips admits that both he and Spruiel were paranoid, which he attributed to the drugs they had used.  By the time they reached Wood County, Phillips said he felt more logical but Spruiel was still "antsy" and "tripping."  Spruiel insisted to Phillips that they were still being followed.  Phillips assured him that they were not, until they heard "a boom."  He explained,

> When you hear the boom, I hit the gas.  I said, "I swear to [G]od you are right, they are shooting at us."  We get a quarter mile up and you hear another boom.  When you hear the boom, I go, "Uh-oh," and then that is when I lost control of the car, the car spinned, the airbag deployed in my face.

{¶ 26} Phillips does not know the source of the first "boom," but said the second one came from inside the car when Carl Spruiel fired a gun.  After the car came to a stop, Spruiel pointed the gun at him and said, "Bitch, you better not tell on me.  I swear to [G]od you better eat this.  I will get your people.  You run. * * *."

8.

{¶ 27} Phillips admits to stealing a gas can that was left outside of a garage and a bicycle from another property. He further admits that he took some clothing, including a Harley Davidson shirt, shorts, and hat, but insists he found them outside, in a field. He denies that he ever went into a camper or anyone's home.

{¶ 28} By way of explanation, Phillips offered that he initially admitted to the shooting because he was afraid of Spruiel. He testified that Spruiel was known to be violent and that Spruiel had lied about how they knew each other. Phillips claims that they met while serving time together in prison, from 2009-2012. He also claims that Spruiel could not have been listening to music while in the car, as Spruiel testified, because he had left his phone in West Virginia. Also, given the angle at which the bullet landed, Phillips claims he could not have fired the gun, given where he was seated in the driver's seat.

{¶ 29} Phillips was indicted in two separate cases. In case No. 2015CR0349, Phillips was indicted on one count of Felonious Assault, in violation of R.C. 2903.11(A)(2)D)(1)(a), a felony of the first degree, one count of Having Weapons While Under Disability, in violation of R.C. 2923.13(A)(2)(B), a felony of the third degree and two counts of Carrying Concealed Weapons, in violation of R.C. 2923.12(A)(2)(F)(1), felonies of the fourth degree. The charged counts included multiple specifications.

{¶ 30} In case No. 2015CR0388, Phillips was indicted on one count of Trespass in a Habitation, in violation of R.C. 2911.12(B)(E), a felony of the fourth degree and four counts of Breaking and Entering, in violation of R.C 2911.13(A)(C), all felonies of the

9.

fifth degree. Prior to trial, the last count of breaking and entering, Count 5, was dismissed by the state.

{¶ 31} At the conclusion of the evidence, a jury found Phillips guilty with regard to all counts, in each case. The trial court sentenced Phillips to 41.5 years in prison. Phillips was appointed appellate counsel and raises the following assignments of error for our review.

**Assignments of Error**

1. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §10 of the Ohio Constitution.

2. The trial court committed error to the prejudice of appellant by imposing costs of prosecution without consideration of appellant's present or future ability to pay.

3. The trial court erred to the prejudice of appellant in denying his rule 29 motion upon completion of the state's case in chief.

4. The jury's verdict was against the manifest weight of evidence presented at trial.

**Costs**

{¶ 32} We begin with Phillips' second assignment of error. The judgment entry in both cases is identical with regard to costs. In each, the court stated, "Defendant shall pay the costs associated with these cases and judgment for such costs is hereby awarded to Wood County." Likewise, during the sentencing hearing, the court ordered, "[Phillips]

10.

will have to pay the costs of this matter for which judgment is awarded to Wood County."

{¶ 33} Phillips argues that the record is unclear as to what type of "costs" the trial court imposed. To the extent that the trial court imposed the costs of prosecution, confinement, and/or appointed counsel, Phillips objects.

{¶ 34} Our standard of review on this issue is whether the imposition of costs and financial sanctions was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b). *State v. Farless,* 6th Dist. Lucas Nos. L-15-1060, 2016-Ohio-1571, ¶ 4 citing *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, ¶ 30 ("An appellate court may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law.").

{¶ 35} With regard to the costs of prosecution, R.C. 2947.23(A)(1)(a) provides that the trial court shall include in every sentencing judgment the costs of prosecution without consideration of whether the defendant has the ability to pay such costs. *State v. Rohda*, 6th Dist. No. F-06-007, 2006-Ohio-6291, ¶ 13.

{¶ 36} If the offender files a motion for waiver of payment of the court costs, the trial court has the discretion to waive payment of court costs. R.C. 2949.092; *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 11. Although Phillips did not file a motion for a waiver, he may do so in the future. R.C. 2947.23(C) provides that the trial court retains jurisdiction to address the waiver, suspension, or modification of the payment of the court costs. Therefore, Phillips need not have moved at the time of sentencing for waiver of the payment of costs. *State v. Farnese*, 4th Dist. Washington No. 11.

15CA11, 2015-Ohio-3533, ¶ 12-16. The decision of whether to seek a waiver at the time of sentencing or a later date is a matter of strategy and cannot be reviewed on appeal. *State v. Pultz*, 6th Dist. Wood No. WD-14-083, 2016-Ohio-329. *State v. Farless*, 6th Dist. Lucas Nos. L-15-1060, 1061, 2016-Ohio-1571, ¶ 6-7. Accordingly, we conclude that the trial court did not err by imposing the costs of prosecution.

{¶ 37} Prior to imposing the costs of confinement and assigned counsel, the trial court must first find that the defendant has, or will have, the ability to pay. For example, R.C. 2929.18(A)(5)(a)(ii) requires that the trial court impose against all convicted defendants a financial sanction for the costs of confinement in a state institution "to the extent he is able to pay." Likewise, R.C. 2941.51(D) provides that the cost of appointed counsel must be paid by the county as approved by the court. The court can order the defendant to pay all or a part of the cost of appointed counsel but only if the court determines that the offender "has, or reasonably may be expected to have, the means to meet some part of the costs of the services rendered." *Id.*

{¶ 38} Although the court is not required to conduct a hearing on a defendant's ability to pay, the record must contain some evidence that the court considered the defendant's financial ability to pay. *State v. Maloy*, 6th Dist. Lucas No. L-10-1350, 2011-Ohio-6919, ¶ 13.

{¶ 39} We cannot ascertain from the record what "costs" the trial court intended to impose. We agree with Phillips that, to the extent the trial court intended to impose the costs of confinement and/or the costs of appointed counsel, the record does not support imposition of either, absent a finding that Phillips has, or reasonably will have, the ability

12.

to pay them. On that limited basis, we find Phillips' second assignment of error well-taken. We vacate those portions of the sentencing entries, to the extent that the lower court imposed the costs of his confinement and/or appointed counsel. *See, e.g. State v. Jones,* 6th Dist. Lucas No. L-13-1193, 2015-Ohio-629, ¶ 104.

### Effective Assistance of Trial Counsel

{¶ 40} The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove a claim of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs one and two of the syllabus, citing *Strickland* at 688.

{¶ 41} A reviewing court must determine whether trial counsel's assistance fell below an objective standard of reasonable advocacy. *Bradley* at 141-142. Moreover, the deficient performance must have been so serious that, "were it not for counsel's errors, the result of the trial would have been different." *Id.* at 141-142.

{¶ 42} Moreover, trial strategy "must be accorded deference and cannot be examined through the distorting effect of hindsight." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, at 691.

{¶ 43} Phillips cites five instances of ineffective assistance of counsel.

13.

**{¶ 44}** First, he alleges that counsel should have requested a psychological examination for purposes of determining his competency. Given the extreme nature of his conduct – shooting at a trooper's vehicle and then confessing to it multiple times – Phillips argues that a psychological expert may have supported a not guilty by reason of insanity ("NGRI") defense. We find no merit to Phillips' argument.

**{¶ 45}** Appellant's theory at trial was that he fabricated his confession because he feared that Spruiel would harm his family. While the jury did not find Phillips' explanation believable, it is a rational argument and points to Phillips' ability to assist in his own defense.

**{¶ 46}** Phillips also cites Trooper Ashenfelter's description of him as "delusional but coherent" to support his argument that his attorney should have investigated his competency. We find, however, that the trooper's off-hand description of Phillips' demeanor was more than overshadowed by other evidence of his competence. Indeed, Phillips' confessions, to three separate police officers, were consistent and were offered voluntarily, not the result of pressure or coercion by the police. *State v. Nelson*, 6th Dist. Lucas No. L-15-1190, 2016-Ohio-7115, ¶ 33-35 (Failure to call a "false confession expert" did not amount to ineffective assistance of counsel where confessions were consistent throughout police interviews and there was no evidence that police pressured the defendant to confess.) Further, during his interview with Trooper Petro, Phillips expressed remorse and cried, demonstrating his understanding of right from wrong, the antithesis to an NGRI defense. Moreover, Phillips' decision to flee the scene in an attempt to evade capture indicates an understanding of wrongfulness which, as a matter

14.

of law, does not support a NGRI defense. *State v. Myers,* 10th Dist. Franklin No. 09AP-926, 2010-Ohio-4602, ¶ 17, citing *State v. Saleh*, 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 86 (Engaging in furtive conduct is reflective of a consciousness of guilt.)  We find that trial counsel's decision not to retain a psychological expert was a strategic decision and does not give rise to a claim for ineffective assistance of counsel.

{¶ 47} Second, Phillips claims that trial counsel should have impeached Carl Spruiel by calling C.F. as a witness, whom he argues would have supported his story that Spruiel lied on the witness stand about going to West Virginia.  Phillips also claims that record evidence would have shown that he and Spruiel met in prison, contrary to the latter's testimony.  Matters pertaining to trial counsel's cross-examination and whether to call certain witnesses are matters of trial tactics.  See *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).   Moreover, counsel aggressively cross-examined Spruiel as to Spruiel's truthfulness on these two points, i.e. how they met and/or whether or not Spruiel accompanied Phillips to West Virginia.  *State v. Treesh*, 90 Ohio St.3d 460, 489, 439 N.E.2d 749 (2001) ("[Trial] counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court.").

{¶ 48} Third, Phillips questions his counsel's failure to obtain expert witnesses. He argues that a ballistics expert may have supported his theory that, given the trajectory of the bullet, he could not have fired the weapon from his position in the driver's seat. Deciding whether or not to call an expert witness is solely a matter of trial strategy. Indeed, "trial counsel's decision not to seek expert testimony is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant."

15.

(Citations omitted.)  *State v. Jackson,* 10th Dist. Franklin No. 02AP-867, 2003-Ohio-6183, ¶ 76.  We find that trial counsel's decision not to retain a ballistics expert falls within the ambit of trial tactics and does not support his case of ineffective assistance of trial counsel.

{¶ 49} Next, Phillips challenges his attorney's decision not to present expert testimony to oppose the information provided by the state's expert on DNA identification.  Phillips' trial counsel was not bound to utilize a DNA expert in order to provide a competent defense.  A review of the record demonstrates that trial counsel performed a knowledgeable cross-examination of the state's DNA expert, wherein the expert conceded that it was "possible" that a "secondary transfer" of DNA could occur, whereby a person's DNA can be transferred from one surface to another.   This supported Phillips' theory of the case - that his DNA landed on the trigger of the gun when Spruiel was threatening him with a gun near his face.  The decision not to call an expert and instead to rely on cross-examination does not constitute ineffective assistance of counsel. *State v. Nicholas,* 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State v. Thompson,* 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987).

{¶ 50} Finally, Phillips alleges that "given the length of the sentence imposed by the trial court, 41 years and 6 months, an objection should have been made by counsel to the imposition of court costs."

{¶ 51} As previously discussed, we have found that the costs of prosecution were properly imposed.  On the other hand, we vacated imposition of the costs of confinement and appointed counsel.   Given our decision, therefore, we also find that Phillips suffered

16.

no prejudice by his counsel's failure to object to those costs because he is not subject to them. Therefore, under *Strickland,* Phillips did not, as a matter of law, receive ineffective assistance of counsel as to costs. *State v. Gibson*, 6th Dist. Lucas No. L-14-1162, 2015-Ohio-3613, ¶ 14-15.

{¶ 52} For these reasons, Phillip did not receive ineffective assistance of counsel, and his first assignment of error is found not well-taken.

### Phillips' Motion for Acquittal under Crim.R. 29 Motion

{¶ 53} In his third assignment of error, Phillips argues that the trial court erred in denying his Crim.R. 29 motion at the close of the state's case-in-chief.

{¶ 54} We review a ruling on a Crim.R. 29 motion for acquittal under the same standard used to determine whether there was sufficient evidence to sustain a conviction. *State v. Merritt*, 6th Dist. Fulton No. F-12-009, 2013-Ohio-4834, ¶ 8. Crim.R. 29 provides that, upon a defendant's motion or the court's own motion, after the evidence of either side is closed, the court shall order entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the charged offense.

{¶ 55} "A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 28, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 56} During a sufficiency of the evidence review, an appellate court's function is to "examine the evidence admitted at trial to determine whether such evidence, if

17.

believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus.

{¶ 57} Phillips makes one argument with regard to the trial court's denial of his motion for an acquittal:

> [Phillips] denies firing the weapon but argues, nonetheless, that given his position as the driver of the car, he could not have seen that the vehicle alongside his Charger was in fact a police vehicle. * * * Because the state did not meet [its] burden with regard to all the elements of the Felonious Assault charge, particularly with regard to the attendant mens rea for a Felonious Assault, the trial court erred in denying [his] Crim.R. 29 motion.

{¶ 58} Phillips was charged under R.C. 2903.11(A)(2)(D)(1) which provides, in pertinent part:

> (A) No person shall knowingly do * * * the following:
>
> (2) Cause or attempt to cause physical harm to another * * *by means of a deadly weapon* * *.

18.

(D)(1)(a) Whoever violates this section is guilty of felonious assault. * * * If the victim of a violation of division (A) of this section is a peace officer * * * felonious assault is a felony of the first degree.

{¶ 59} The mens rea for felonious assault is knowingly, which pursuant to R.C. 2901.22(B), is defined as follows:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 60} Phillips' lone argument - that the evidence was legally insufficient to support a conviction because the state failed to prove that he knew he was shooting at a police officer's vehicle - is not well-taken. The state need not have proved that Phillips knew that he was shooting at a police vehicle in order to enhance the offense under R.C. 2903.11(A)(2)(D)(1), the peace officer specification. *State v. Mundy*, 9th Dist. Medina No. 05CA0025-M, 2005-Ohio-6608, ¶ 9-10. *See also State v. Middleton,* 5th Dist. Stark No. 1997CA00158, 1998 Ohio App. LEXIS 325 (Jan. 20, 1998) ("In order to enhance the offense of felonious assault with a peace officer specification, it is not necessary that the

19.

offender knew the victim was a police officer.") and *State v. Cantrell,* 2d Dist. Montgomery No. 11030, 1989 Ohio App. LEXIS 932 (Mar. 24, 1989) ("Defendant's knowledge that the victim is a peace officer is not required in order to invoke the enhanced penalty under R.C. 2903.11.").

{¶ 61} We also find that, despite Phillips' contention to the contrary, ample evidence was presented at trial from which the trier-of-fact could determine that Phillips fired his gun at the police cruiser. When viewing the evidence presented in the light most favorable to the prosecution, we cannot find that insufficient evidence was presented to convict Phillips of felonious assault or the accompanying specification. *Accord State v. Hicks*, 3d Dist. Seneca No. 13-14-9, 2014-Ohio-5630, ¶ 37. Accordingly, Phillips' third assignment of error is not well-taken.

### The Manifest Weight of the Evidence

{¶ 62} In his final assignment of error, Phillips argues that the jury's verdict was against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387. "'[I]t is inappropriate for a reviewing court to

20.

interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Miller,* 6th Dist. Lucas No. L-08-1056, 2009-Ohio-2293, ¶ 21, quoting *State v. Brown,* 10th Dist. No. 02AP-11, 2002-Ohio-5345, ¶ 10.

{¶ 63} Phillips makes five arguments in support of his claim that the verdict was against the manifest weight of the evidence. First, he cites the testimony of Jessica Mendofik, the state's fingerprint expert, who testified that she could not conclude, to a reasonable degree of certainty, who had handled the firearm prior to her testing. We note that Mendofik also testified that it is uncommon to be able to find "usable latent prints" on firearms.

{¶ 64} Second, Phillips cites the testimony of DNA expert Herdeman who, while under cross examination, said that it was "possible" that Phillips' DNA was found on the trigger of the gun as a result of a secondary transfer, meaning that his skin cells could have been transferred from one surface to another, here the trigger of the gun. If believed, then there was no DNA evidence connecting him to the gun. Again, we note that Herdeman also said that it was "not feasible or likely for there to be a secondary transfer."

{¶ 65} Third, Phillips cites the absence of any gunshot residue on him. As explained by Trooper Ashenfelter, however, many factors could account for the absence of any residue on his hands, including the amount of time, in this case 11 hours, that elapsed between the shooting and the test, the wind in Phillips' vehicle that would have been generated by opening up the car window while driving in

21.

excess of 85 miles per hour, the fact that Phillips spent hours crawling through the mud in soy bean fields, not to mention the evidence gathered that suggested Phillips may have used hand wipes and/or sanitizer.

{¶ 66} Fourth, without elaborating, Phillips argues that Carl Spruiel "lacked all credibility in his testimony."

{¶ 67} Finally, Phillips argues that it was physically impossible for him to drive his vehicle and shoot at the cruiser, given the trajectory of the bullet.

{¶ 68} "[W]eight and credibility [of evidence] are primarily for the trier of fact." *State v. Pena*, 6th Dist. Lucas No. L-12-1309, 2014-Ohio-423, ¶ 22. This is because the trier of fact is in the best position to "view the witnesses and observe the credibility of the proffered testimony," (Quotation omitted.) *Id.* A jury, or a judge may believe all, part, or none of a witness's testimony. *Id.*

{¶ 69} The jury heard all of the evidence cited above by Phillips and made judgments about what weight, if any, to give it. The central issue in this case was whether Phillips was the shooter. Based upon its verdict, the jury clearly was persuaded by Phillips' multiple confessions to the police, in which he consistently acknowledged that he shot at the trooper's vehicle. We have reviewed the entire record, and we find no basis to interfere with the findings of the jury inasmuch as there is no indication that it "lost its way and created a manifest miscarriage of justice," necessitating a new trial under *Thompkins.* We conclude that the jury's verdict was not against the manifest weight of the evidence. Accordingly, appellant's fourth assignment of error is not well-taken.

22.

**Conclusion**

**{¶ 70}** Based on the foregoing, the judgment of the Wood County Court of Common Pleas is affirmed, in part, and reversed, in part. To the extent that the lower court's sentencing order required Phillips to pay the costs of his confinement and/or appointed counsel, those portions of the sentencing entries are vacated. *See, e.g. Jones,* 6th Dist. Lucas No. L-13-1193, 2015-Ohio-629, at ¶ 104. The judgments of conviction are affirmed in all other respects.

**{¶ 71}** Phillips is ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                _____

                                                         JUDGE

James D. Jensen, P.J.               

Christine E. Mayle, J.               _____
CONCUR.                                             JUDGE

                                        _____
                                                         JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.